UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

BANK OF AMERICA, N.A.,

                                Plaintiff,

              v.

MADWELL LLC, a New York limited liability
company, GET IN GET OUT LLC, a New York limited
liability company, MILLWRIGHT LLC, a New York
limited liability company, and MAPLE SYRUP AND
JAM LLC d/b/a Starfish, a New York limited liability
company,

                                Defendants.
-------------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**

24-CV-6005
(Donnelly, J.)
(Marutollo, M.J.)

**JOSEPH A. MARUTOLLO, United States Magistrate Judge:**

       Plaintiff Bank of America N.A. brings this action against Defendants Madwell LLC, a New

York limited company ("Madwell"); Get In Get Out LLC, a New York limited liability company

("GIGO"); Millwright LLC, a New York limited liability company ("Millwright"); and Maple

Syrup and Jam LLC d/b/a Starfish, a New York limited liability company ("MSJ") (collectively,

"Defendants").   Dkt. No. 1 at ¶ 8.   Plaintiff seeks to enforce its rights under a certain loan

agreement, certain related security agreements, and certain related guaranty agreements in

connection with a $4,000,000 line of credit and a term loan in the amount of $500,000 it extended

to Defendants.  *Id.* at ¶¶ 8-9.  Plaintiff alleges eight causes of action against Defendants, including

those for breach of contract, foreclosures of security interest, replevin, conversion, and unjust

enrichment.  *Id.* at ¶¶ 31-88.

       Presently before the Court, on referral from the Honorable Ann M. Donnelly, United States

District Judge, is Plaintiff's motion "for entry of consented money judgment and order directing

turnover of collateral."  Dkt. No. 26 ("Plaintiff's Motion").  Plaintiff asserts that it is entitled to

entry of a consent judgment "based on defaults under a settlement agreement executed by

[Plaintiff] and [Defendants], which expressly authorized this Court to enter judgment against Defendants upon the submission of a declaration by [Plaintiff] of the defaults, the amount paid to [Plaintiff] pursuant to the settlement, and amount remaining due." Dkt. No. 26-2 at 3.[1] Defendants oppose the motion. Dkt. No. 34.

For the reasons set forth below, the undersigned respectfully recommends that Plaintiff's Motion be granted.

## I. **Background**

### A. **Factual Background**

#### i. **The Loans and Loan Agreement**

Plaintiff is "a national banking association charted under the laws of the United States of America" having its principal place of business and primary office in Charlotte, North Carolina, as designated by its articles of association. Dkt. No. 1 at ¶ 3. Plaintiff brings this action in its capacity as a commercial lender. *Id.* at ¶ 8.

Defendants Madwell, GIGO, and MSJ are New York limited liability companies which maintain their principal places of business at 65 Porter Avenue in Brooklyn, New York. *Id.* at ¶¶ 4-5, 7. Defendant Millwright is also a New York limited liability company, with its principal place of business at 555 Johnson Street in Brooklyn, New York. *Id.* at ¶ 6.

On May 6, 2019, Plaintiff entered into a loan agreement with Madwell (the "Loan Agreement") where Plaintiff agreed to issue loans to Madwell. *Id.* at ¶ 10; *see also* Dkt. No. 1-1 (containing copy of the loan agreement). Specifically, Plaintiff provided Madwell with: "(a) a line of credit in the current maximum principal amount of $4,000,000.00" ("Working Capital Loan");

---

[1] Page citations are to the ECF-stamped page numbers.

and "(b) a term loan in the original principal amount of $500,000.00" ("Leasehold Improvements Loan") (collectively the "Loans").  Dkt. No. 1 at ¶ 9; Dkt. No. 1-1 at 2-3.

Under the Loan Agreement, the Loans were "revolving line[s] of credit," meaning that "[d]uring the availability period, [Madwell] may repay principal amounts and reborrow them."  Dkt. No. 1-1 at 2-3.  Concerning the Working Capital Loan, the parties agreed that the line of credit would be available until May 6, 2021 unless renewed by Plaintiff, at its discretion.  *Id.* at 2.  As for the Leasehold Improvements Loan, the Loan Agreement provided that the line of credit would be available until November 6, 2019.  *Id.* at 3.  Madwell agreed to pay monthly interest on the Working Capital Loan, which it would "repay in full all principal, interest, or other charges outstanding" at the expiration date.  *Id.*  Madwell further agreed to repay the Leasehold Improvements Loan "in equal installment beginning on November 30, 2019, and on the last day of each month thereafter, and ending on November 6, 2024," with the option of prepaying the loan in full or in part at any time.  *Id.* at 3-4.

In the event of any default on the payments pursuant to the Loan Agreement, Plaintiff reserved certain rights it could exercise without prior notice, including the ability to: "declare [Madwell] in default, stop making any additional credit available to [Madwell], and require [Madwell] to repay its entire debt immediately."  *Id.* at 13; Dkt. No. 1 at ¶ 14.  Upon any default by Madwell, the agreement imposed a "default rate," which provided that "all amounts outstanding under this Agreement, including any unpaid interest, fees, or costs, will at the option of [Plaintiff] bear interest at a rate which is 6.0 percentage point(s) higher than the rate of interest otherwise provided in this Agreement."  Dkt. No. 1 at ¶ 15; Dkt. No. 1-1 at 6.

### ii.    Security Agreement

3

Concurrent to the execution of the loan agreement, Madwell additionally executed and delivered to Plaintiff a security agreement (the "Security Agreement"), dated May 6, 2019, to serve "as collateral security for the prompt and complete payment and performance of [Madwell's] then or thereafter-existing debts, obligations, and liabilities to [Plaintiff]." Dkt. No. 1 at ¶ 16; Dkt. No. 1-7 at 2. The Complaint represents that Madwell, as the pledgor, "granted to [Plaintiff] a first priority blanket security interest upon all assets of [Madwell]," defined as "Collateral," including the following:

> (a) All accounts, and all chattel paper, instruments, deposit accounts, letter of credit rights, and general intangibles related thereto and all returned or repossessed goods which, on sale or lease, resulted in an account[;]
>
> (b) All inventory[;]
>
> (c) All equipment and fixtures now owned or hereafter acquired by the Pledgor[;]
>
> (d) All negotiable and nonnegotiable documents of title covering any Collateral[;]
>
> (e) All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral[;]
>
> (f) All substitutes or replacements for any Collateral, all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral [; and]
>
> (g) All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory[.]

Dkt. No. 1 at ¶ 17; Dkt. No. 1-7 at 2. The Complaint continues that Plaintiff "perfected its security interest in [Madwell's] Collateral" by filing the relevant documents with the Secretary of State of the State of New York. Dkt. No. 1 at ¶ 18; *see also* Dkt. No. 1-8.

### iii.    Amendments to the Agreements

The Loan Agreement was amended on five occasions by the parties.  Dkt. No. 1 at ¶ 11; *see also* Dkt. No. 1-2; Dkt. No. 1-3; Dkt. No. 1-4; Dkt. No. 1-5; Dkt. No. 1-6 (containing copies of the five amendments).  The first three amendments, in pertinent part, extended the maturity date of the Working Capital Loan.  *See* Dkt. No. 1 at ¶ 12; *see also* Dkt No. 1-2, Dkt. No. 1-3; Dkt. No. 1-4.[2]

On November 16, 2023, Plaintiff and Madwell executed the fourth amendment to the Loan Agreement ("Amendment No. 4").  Dkt. No. 1 at ¶ 19; Dkt. No. 1-5.  As part of Amendment No. 4, GIGO, Millwright, and MSJ "each executed a Continuing and Unconditional Guaranty in favor of [Plaintiff]" concerning Madwell's obligations under the Loan Agreement (the "Guaranty").  Dkt. No. 1 at ¶ 19; Dkt No. 1-5 at 3.  The "Guarantors"—GIGO, Millwright, and MSJ—contracted to "absolutely and unconditionally guaranteed" Madwell's performance of its obligations to Plaintiff under the Loan agreements, "including any attorneys' fees and costs incurred by [Plaintiff] in collecting any sums to it."  Dkt. No. 1 at ¶ 19; Dkt. No. 1-9 at 7 (containing copy of the Guaranty).  Further, the Guarantors agreed that if any individual guarantor "fail[ed] to fulfill its duty to pay any and all of the indebtedness guaranteed, [Plaintiff] would be entitled to immediately enforce Guaranty against each of the Guarantors, including, but not limited to declaring the indebtedness to be immediately due and payable to [Plaintiff]."  Dkt. No. 1 at ¶ 20; Dkt. No. 1-9 at 7.

The Guarantors additionally executed similar security agreement ("Guarantor Security Agreement") to Madwell's Security Agreement "as collateral security for the prompt and complete payment and performance of [their] obligations to [Plaintiff.]"  Dkt. No. 1 at ¶ 2; Dkt. No. 1-10

---

[2]  For the purposes of the instant matter before the Court, the fifth amendment to the Loan Agreement did not substantively change the parties' obligations.  *See generally* Dkt. No. 1-6 (containing copy of the fifth amendment dated March 18, 2024).

(containing copy of Guarantor Security Agreement).  Pursuant to the Guarantor Security Agreement, "each of the Guarantors, as Pledgor, granted to [Plaintiff] a first priority blanket security interest upon all assets of the Guarantors" ("Guarantor Collateral"), including:

> (a) All accounts, and all chattel paper, instruments, deposit accounts, letter of credit rights, and general intangibles related thereto and all returned or repossessed goods which, on sale or lease, resulted in an account[;]
>
> (b) All inventory[;]
>
> (c) All equipment and fixtures now owned or hereafter acquired by the Pledgor[;]
>
> (d) All negotiable and nonnegotiable documents of title covering any Collateral[;]
>
> (e) All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral[;]
>
> (f) All substitutes or replacements for any Collateral, all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral [; and]
>
> (g) All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory[.]

Dkt. No. 1-10 at 2; Dkt. No. 1 at ¶ 22.  Plaintiff perfected its security interest in the Guarantor Collateral by filing the relevant documents on November 20, 2023.  Dkt. No. 1 at ¶ 23; Dkt. No. 1-11.

As part of Amendment No. 4, the parties agreed that Madwell would "repay the Working Capital Loan and the Leasehold Improvements Loan by June 30, 2024," referred to as the "Maturity Date" in the Loan Agreement.  Dkt. No. 1 at ¶ 13; Dkt. No. 1-4 at 2.

### iv.    Defendants' Default and the Turnover Demand

6

According to Plaintiff, Madwell "failed to repay the Working Capital Loan and the Leasehold Improvements Loan on or before the Maturity Date (June 30, 2024), which constituted an event of default pursuant to the Loan Agreement." Dkt. No. 1 at ¶ 25.

Plaintiff sent Madwell written notice of the default by letter on July 9, 2024. *Id.* at ¶ 26; Dkt. No. 1-12 (containing copy of default notice). That notice demanded "payment in full of the Loans and all other amounts due pursuant to the [Loan Agreement] on or before July 19, 2024." Dkt. No. 1-12 at 3. Additionally, Plaintiff advised Madwell that it "implemented the default rate of interest on the Loans, effective July 1, 2024." *Id.*

Despite Plaintiff's notice, Defendants allegedly failed to pay the amount demanded by the July 19, 2024 deadline. Dkt. No. 1 at ¶ 28.

On July 23, 2024, Plaintiff sent Defendants another letter demanding turnover of the Collateral in the Security Agreement and the Guarantor Security Agreement by July 29, 2024. *Id.* at ¶ 29. Defendants, however, failed to turn over any Collateral to Plaintiff. *Id.* at ¶ 30.

### B.     Procedural History

On August 27, 2024, Plaintiff filed the instant action, invoking diversity jurisdiction under 28 U.S.C. § 1332. *See generally* Dkt. No. 1. The Complaint alleges eight causes of action: (i) breach of contract against Madwell for its obligations under the Loan Agreement; (ii) foreclosures of security interest against Madwell; (iii) replevin against all Defendants; (iv) conversion against all Defendants; (v) unjust enrichment against all Defendants; (vi) breach of contract against GIGO its obligations under the Guaranty; (vii) breach of contract against Millwright for its obligations under the Guaranty; and (viii) breach of contract against MSJ for its obligations under the Guaranty. *Id.* at ¶¶ 31-88.

### C.     The Settlement Agreement

On October 9, 2024, the parties advised the Court that they were "actively engaged in settlement discussions which seem likely to result in a settlement resolving this case" since the filing of the Complaint. *See* Dkt. No. 14 at 2. After the Court extended Defendants' deadline to answer the Complaint (Text Order dated Nov. 6, 2025), the parties instead filed a stipulation of settlement and a joint motion to stay the action after executing a settlement agreement to purportedly resolve the action (the "Settlement Agreement"). Dkt. No. 21 at 2-3.

The terms of the Settlement Agreement provided for a series of payments by Defendants to Plaintiff. *See, e.g.*, Dkt. No. 26-1 at 7-22 (containing copy of the Settlement Agreement). Defendants first agreed a series of monthly interest payments "[o]n the last day of each month, commencing with November 30, 2024, and continuing through January 31, 2025," consisting of "accrued interest at the non-default rate applicable to the loans[.]" *Id.* at 11. Defendants further agreed to pay four "principal reduction payments" on certain dates and in certain amounts: "(a) [a] payment of $400,000.00 on November 15, 2024, which shall first be used to repay the remaining balance of the Leasehold Improvements Loan and then to reduce the balance of the Working Capital Loan"; "(b) [a] payment of $400,000.00 on November 30, 2024"; "(c) [a] payment of $400,000.00 on December 31, 2024"; and "(d) [a] payment of $50,000.00 on January 31, 2025." *Id.* The "Final Payment," to be made by February 28, 2025, would consist of Defendants paying "all remaining principal, accrued and unpaid contract rate and Default Interest, [Plaintiff's] fees, costs and expenses, and attorneys' fees, costs, and expenses then outstanding under the [Loan Agreement], unless waived[.]" *Id.* at 12.

The Settlement Agreement also provided that Defendants' failure to make any of the payments pursuant its terms would be deemed an "Event of Termination." Dkt. No. 22 at 2; Dkt. No. 26-1 at 15-16. Upon an Event of Termination, the parties authorized this Court to enter

judgment "in favor of [Plaintiff] and against each of the [Defendants] for, among other things, turnover of the Collateral and, jointly and severally, for the [outstanding balance of the Loans]." Dkt. No. 26-1 at 12.  To be entitled to entry of judgment following an Event of Termination, Plaintiff agreed to submit to the Court "a Declaration setting forth (a) the Payment Default, and (b) the portion, if any, of the Settlement Payments actually received by [Plaintiff] previously applied to the [outstanding balance of the Loans], and (c) the amount of the [outstanding balance of the Loans] then remaining unpaid."  Dkt. No. 26-1 at 4, 12.

Concerning the stipulation of settlement, the parties agreed that the action would "be marked as settled and shall be stayed until the earlier to occur of (i) March 7, 2025; or (ii) the occurrence of any Event of Termination pursuant to the terms of the Settlement Agreement."  Dkt. No. 21 at 2.  The parties further agreed that the Court "shall retain jurisdiction over this matter to enforce the terms of the Settlement Agreement and to grant such other relief as may be necessary to enforce Plaintiff's rights and remedies, including but not limited to entry of a judgment in accordance with the terms of the Settlement Agreement[.]"  *Id.* at 3.  Finally, the parties stipulated that "Plaintiff shall submit a Notice of Voluntary Dismissal of this action, promptly after Defendants have fully performed their obligations pursuant to the Settlement Agreement and the expiration of any applicable waiting period set forth therein."  *Id.*

On November 20, 2024, the undersigned so ordered the parties' stipulation of settlement and retained jurisdiction over the matter to enforce the terms of the settlement by staying the case, pending a filing of the notice of voluntary dismissal once Defendants performed their obligations under the Settlement Agreement.  Text Order dated Nov. 20, 2024.

**D.     Defendants' Default Under the Settlement Agreement**

On December 19, 2024, the parties filed a joint status report advising the Court that "Defendants failed to make a payment due under the Settlement Agreement on November 30, 2024, which is an Event of Termination under the Settlement Agreement."  Dkt. No. 22 at 2. Plaintiff represents that it provided written notice to Defendants that an Event of Termination was triggered, that Plaintiff "reserved its rights under the Settlement Agreement" and Loan Agreement, but that it had not yet "elected to enforce any of its rights and remedies under the Settlement Agreement or otherwise[.]"  *Id.*  The Court ordered the parties to advise whether the Settlement Agreement remained in effect.  Text Order dated Dec. 19, 2024.

On December 27, 2024, the parties filed another status report.  Dkt. No. 23.  The parties stated that "Defendants have represented that they will make the payment originally due November 30, 2024, by December 31, 2024, and the payment originally due December 31, 2024, by January 14, 2025."  *Id.* at 2.  Plaintiff again conveyed that it had not yet elected to enforce any rights or remedies under the Settlement Agreement, including seeking entry of a stipulated judgment.  *Id.* The Court again ordered the parties to file a joint status report by January 3, 2025.  Text Order dated Dec. 27, 2024.

In accordance with the Court's status report order, the parties filed a third status report on January 3, 2025.  Dkt. No. 24.  Plaintiff advised that Defendants again failed to make the payment on December 31, 2024—originally due November 30, 2024—and that it would now "seek enforcement of certain of its rights and remedies under the Settlement Agreement, including entry of a stipulated judgment against Defendants."  *Id.* at 2-3.  The Court ordered Defendants to respond to Plaintiff's allegations by January 6, 2025.  Text Order dated Jan. 3, 2025.

On January 6, 2025, Defendants confirmed that they "did not timely make all payments pursuant to the terms of [the] Settlement Agreement."  Dkt. No. 25 at 1.  Defendants attributed

their failure to cash flow problems that "did not permit them to timely make the required payments to Plaintiff per the terms of the Settlement Agreement without missing payroll and business expenses required to sustain revenue-generating operations." *Id.* Defendants further reiterated their desire for a "consensual resolution to this matter if possible and consistent with the realities of their operational cash flow." *Id.*

On receipt of Defendants' submission, the Court scheduled a status conference to discuss the parties' dispute for February 4, 2025. Text Order dated Jan. 7, 2025. The Court also ordered the parties to file a status report concerning the outstanding payments by February 3, 2025. *Id.*

### E.      Plaintiff's Motion

On January 20, 2025, ahead of the scheduled status conference before the Court, Plaintiff filed the instant motion for judgment based on the Settlement Agreement. *See* Dkt. No. 26; Dkt. No. 26-2. Plaintiff included a proposed judgment and a declaration, as required by the Settlement Agreement, to trigger entry of a stipulated judgment. *See* Dkt. No. 26-1; Dkt. No. 26-3.

Specifically, Plaintiff seeks entry of a consented money judgment and order directing turnover of collateral pursuant to the terms of the Settlement Agreement in light of Defendants' failure to pay the principal reduction payments due on November 30, 2024 and December 31, 2024, as well as the missed monthly interest payment due on December 31, 2024. Dkt. No. 26-2 at 3-6; Dkt. No. 26-1 at 3. At the time of filing, Plaintiff calculated that Defendants still owed $4,100,359.81, with "[i]nterest and default interest continu[ing] to accrue at the per diem rate of $1,384.54 after January 6, 2025." Dkt. No. 26-2 at 5; Dkt. No. 26-1 at 3. Plaintiff thus requests entry of a money judgment in the amount that Defendants still owe, as well as an order directing a turnover of the Collateral agreed upon by Defendants in the Security Agreement and the Guarantor

Security Agreement.  Dkt. No. 26-2 at 6; Dkt. No. 26-3 at 3-4 (containing Plaintiff's proposed judgment).

### F.    Events Subsequent to Plaintiff's Motion

On February 3, 2025, the parties filed a joint status report ahead of the February 4, 2025 conference, as directed by the undersigned.  Dkt. No. 27.  The parties advised the Court as to their attempts in reaching "mutually acceptable, modified payment terms," but that no agreement had come to fruition.  *Id.* at 3.  Defendants reiterated their financial difficulties, explaining that they were "significantly challenged in terms of liquidity, though they remain hopeful to locate additional capital in order to provide more certainty on settlement terms with [Plaintiff]."  *Id.* Plaintiff further indicated that it intended to request entry of the judgment as requested in its motion "unless Defendants file papers opposing [the request]."  *Id.*

On February 4, 2025, a status conference was held before the undersigned, where Defendants' outstanding debts to Plaintiff were discussed.  Minute Entry dated Feb. 4, 2025.  The Court ordered that the parties file a status report by February 13, 2025, outlining the status of discussions concerning a revised settlement agreement, any plan of action in executing such an agreement, and what Plaintiff required from Defendant to proceed with any revised settlement agreement.  *Id.*  The Court further ordered Defendants to respond to Plaintiff's Motion by February 20, 2025.  *Id.*

On February 13, 2025, the parties filed another status report.  Dkt. No. 29.  The parties advised that they were unable to resolve the outstanding issues, and that Plaintiff renewed its request for entry of judgment against Defendants.  Dkt. No. 30 at 5.

After Defendants failed to file a response to Plaintiff's Motion by February 20, 2025, the Court scheduled another status conference with the parties.  Text Order dated Feb. 26, 2025.  On

February 27, 2025, Defendants advised that they obtained new counsel of record, who was substituted for their previous counsel.  Dkt. No. 32; Text Order dated Feb. 27, 2025.  After Defendants requested additional time to respond to Plaintiff's Motion, the Court allowed Defendants to file their response by March 17, 2025, and additionally adjourned the status conference it had previously scheduled.  Dkt. No. 33; Text Order dated Mar. 13, 2025.

On March 17, 2025, Defendants filed their response in opposition to Plaintiff's Motion. *See* Dkt. No. 34.  Defendants again expressed that they were "under unprecedented financial stress" causing them "to struggle to remain current on payroll and legal invoices."  *Id.* at 1.  In providing context for their economic circumstances, Defendants "share[d] key aspects of the factual and contractual underpinning of this dispute that have not yet been raised."  *Id.*

Included in this explanation was information that their "former 50% owner and CFO, David Eisenman [], obtained and repeatedly expanded the credit line and debt presently in dispute without the knowledge or consent of Christopher Sojka, then a 50% owner of Defendants (and now Defendants' sole owner)."  *Id.* at 2.  Eisenman allegedly "repeatedly and improperly wired directly from Madwell's [account with Plaintiff] to [his] own personal bank account in clear and objective contravention of Madwell's [o]perating [a]greement," which "prohibited [] unauthorized unilateral distributions to a [m]ember with a negative capital account balance, which has described Eisenman's capital account for over three years."  *Id.*  Defendants contend that Eisenman further barred Sojka from accessing or initiating transactions with Madwell's bank account despite Sojka's repeated requests, and that Plaintiff "declined multiple Sojka requests for assistance stopping Eisenman's unauthorized ultra vires transactions[.]"  *Id.*

Defendants challenge the enforceability of the Loan Agreement itself, contending that the agreement was signed by Eisenman and an individual named Daniel Tucker, who held himself out

as Madwell's CFO. *See id.* at 4. Defendants allege that the Loan Agreement was concealed from Sojka, and that Eisenman "obtained this credit line by making a series of objectively false statements and material misrepresentation to [Plaintiff], which [Plaintiff] either refused to review or decided to remain willfully blind of." *Id.* at 5. Additionally, Defendants allege that "Madwell's operating agreement prohibited the Loan Agreements Plaintiff seeks to enforce," as it "proscribes a single [m]anaging [m]ember from unilaterally 'Transferring' and 'Interest' in or pledging a security interest in the company, which relates directly to the portion of [Plaintiff's] motion seeking a turnover of collateral." *Id.*

Finally, Defendants contend that the relevant agreements "lack any cognizable consideration in exchange for any of the [Plaintiff]-drafted terms and conditions at issue, which largely amount to [Plaintiff] providing Defendants nothing of value (such as a loan) in exchange for Defendants' purported agreement to waive various legal rights and ostensibly patch [Plaintiff's] failure to obtain enforceable agreements as the loans were issued and expanded." *Id.* at 7. Rather, Defendants assert that "[w]hen Plaintiff finally sought Sojka's signature on its loan-related documents, [it] was merely posturing for litigation and maximization of its ability to harvest as many fees, penalties, and default interest revenue streams as possible," and that Plaintiff "has notably and categorically failed to identify any form of consideration that was provided to Defendants in exchange for the recent extraction of Sojka's signature under duress and threats of litigation." *Id.* at 7-8. Defendants therefore request that the Court deny Plaintiff's Motion. *Id.* at 8.

On March 18, 2025, Judge Donnelly referred Plaintiff's Motion to the undersigned for Report and Recommendation. Referral Order dated Mar. 18, 2025.

On March 24, 2025, Plaintiff filed its reply in support of its motion. Dkt. No. 36. Plaintiff disputes the merits of Defendants' response, contending it was "interposed merely to delay entry of the Consent Judgment pursuant to the parties' Settlement Agreement[.]" *Id.* at 2. According to Plaintiff, Defendants' response impermissibly raises matters outside the scope of Plaintiff's Complaint and makes arguments that were expressly released upon execution of the Settlement Agreement. *Id.* Plaintiff's additionally contend that the response "attempts to rehash disputes between Defendants' former member, [Eisenman], and Defendants' current, sole member, [Sojka], which were aggressively litigated in state court litigation by [Sojka] against [Eisenman] and resolved via [a stipulation in that matter]." *Id.* at 2-3.

On April 30, 2025, Plaintiff advised the Court that Defendants' sole member, Mr. Sojka, "advised [Plaintiff's] counsel that 'Madwell will cease operations at 11:59 PM ET on Wednesday, April 30[, 2025].'" Dkt. No. 37 at 1. Mr. Sojka further communicated with Plaintiff that he "fully recognize[s] that [Plaintiff] retains all rights to pursue its remedies," and that he "remain[s] committed to cooperating in every way necessary." *Id.* In response, Plaintiff renewed its request that Defendants "turnover the collateral securing [Plaintiff's] loans and provide various information needed by [Plaintiff] to obtain possession and control of that collateral," as well as asking that Defendants withdraw their response in opposition to its motion. *Id.* According to Plaintiff, counsel for Defendants responded that "'Madwell has neither the time nor capacity' to respond to what he categorized as the 'large quantity of demands' made by [Plaintiff]." *Id.* Plaintiffs thus renewed their request to grant the motion. *Id.* at 1-2.

On May 1, 2025, Defendants affirmed their arguments in their response to Plaintiff's Motion and requested an opportunity to file an "opposition with citations to pertinent authority and the record in connection with the presently pending motion for judgment" or another

conference to discuss the issue before the Court. Dkt. No. 38 at 1. Plaintiff responded that same day, indicating it "strenuously oppose[d]" Defendants' request "for permission to submit further opposition to [Plaintiff's] motion[.]" Dkt. No. 39. The Court did not order any additional briefing.

## II.    Jurisdiction to Enforce the Settlement Agreement

When the parties to an action enter into a settlement agreement, "a district court 'does not automatically retain jurisdiction to hear a motion to enforce' a settlement agreement simply by virtue of having disposed of the original case." *Hendrickson v. United States*, 791 F.3d 354, 358 (2d Cir. 2015) (quoting *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 134 (2d Cir. 2011)). "Instead, a motion to enforce a settlement agreement is fundamentally 'a claim for breach of a contract, part of the consideration of which was dismissal of an earlier federal suit,' and therefore 'requires its own basis for jurisdiction[.]'" *Id.* (quoting *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 381, 378 (1994)).

"To retain jurisdiction, '*Kokkonen* prescribes that a district court's order of dismissal must either (1) expressly retain jurisdiction over the settlement agreement, or (2) incorporate the terms of the settlement agreement in the order.'" *Dannhauser v. TSG Reporting, Inc.*, No. 16-CV-00747 (CM) (DF), 2019 WL 2950142, at *7 (S.D.N.Y. June 21, 2019) (quoting *Hendrickson*, 791 F.3d at 358); *see also Chigirinskiy v. Panchenkova*, 319 F. Supp. 3d 718, 728 (S.D.N.Y. 2018) ("[A] federal court may retain jurisdiction to enforce such agreements where . . . 'the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal—either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order[.]'" (quoting *Kokkonen*, 511 U.S. at 381)).

Here, the undersigned respectfully recommends that the Court has jurisdiction to enforce the terms of the Settlement Agreement. Although there has been no formal order of dismissal disposing of the instant suit, the Court so-ordered the parties' motion to stay proceedings and stipulation of settlement. Dkt. No. 21; Text Order dated Nov. 20, 2024. That stipulation expressly granted the Court authority to "retain jurisdiction over this matter to enforce the terms of the Settlement Agreement and to grant such other relief as may be necessary to enforce Plaintiff's rights and remedies, including but not limited to entry of a judgment in accordance with the terms of the Settlement Agreement[.]" Dkt. No. 21 at 3.

The Court thus explicitly reserved its right to enforce the Settlement Agreement and incorporated the parties' stipulated terms when it so ordered the parties' joint motion to stay and stipulation of settlement on November 20, 2024. "In such cases the district court necessarily ma[kes] compliance with the terms of the [settlement] agreement a part of its order so that a breach of the agreement would be a violation of the order, and the district court may therefore enforce the settlement as an exercise of its ancillary jurisdiction to manage its proceedings, vindicate its authority, and effectuate its decrees." *See StreetEasy, Inc. v. Chertok*, 752 F.3d 298, 305 (2d Cir. 2014) (internal quotations and citations omitted); *cf. Keepseagle v. Vilsack*, No. CV 99-3119 (EGS), 2014 WL 11816917, at *4 (D.D.C. July 14, 2014) ("To the extent Mr. LaBatte can establish jurisdiction, it must arise under [a] situation[] where exercising jurisdiction is necessary to effectuate the Court's Order entering the settlement agreement.").

Accordingly, the undersigned respectfully recommends a finding of jurisdiction over Plaintiff's Motion and the instant dispute.

### III.    **Plaintiff's Request to Enforce the Settlement Agreement**

#### A.    **Choice of Law**

"Settlement agreements are contracts and must therefore be construed according to general principles of contract law." *Chigirinskiy*, 319 F. Supp. 3d at 728 (quoting *Torres v. Walker*, 356 F.3d 238, 245 (2d Cir. 2004)).  As noted above, this case is predicated upon diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).  *See* Dkt. No. 1 at ¶¶ 1, 3-7.  The United States Court of Appeals for the Second Circuit has held that a federal court sitting in diversity applies the choice-of-law rules of the state in which it sits.  *See Maryland Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003) ("A federal court sitting in diversity applies the choice-of-law rules of the forum state") (citation omitted).

 "For contract claims, New York applies a 'grouping of contacts' or 'center of gravity' approach" to determine whether to apply New York substantive law.  *Star Ins. Co. v. Champion Constr. Servs. Corp.*, No. 13-CV-3635 (ARR) (RML), 2014 WL 4065093, at *2 (E.D.N.Y. July 30, 2014) (citations omitted), *report and recommendation adopted*, 2014 WL 4065094 (E.D.N.Y. Aug. 15, 2014).  In making this determination,

> the [C]ourt should consider '(1) any choice-of-law provision contained in the contract; (2) the place where the contract was negotiated, issued, and signed; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties.'

*Id.* (quoting *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 162 (2d Cir. 1998)); *see also Cartagena v. Homeland Ins. Co. of New York*, No. 19-CV-6287 (CM), 2019 WL 6878243, at *4 (S.D.N.Y. Dec. 16, 2019).

Here, the factors favor application of New York law.  The Settlement Agreement contains an express choice of law provision that it "shall be governed and interpreted according to the laws of the State of New York[.]"  Dkt. No. 26-1 at 16.  Defendants are limited liability companies of New York, and the provisions pertain to their businesses and collateral located in New York.  *Id.*

at 7-9.  Furthermore, no party disputes the applicability of New York law in construing the terms of the Settlement Agreement.  As a result, New York law governs interpretation of the Settlement Agreement and Plaintiff's claim.  *See Merch. Cash & Cap., LLC v. Haute Soc'y Fashion, Inc.*, No. 16-CV-2696 (ILG), 2017 WL 2912452, at *2 (E.D.N.Y. July 6, 2017) ("'New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or a violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction'" (quoting *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000))).

Accordingly, the undersigned respectfully recommends that the Settlement Agreement and Plaintiff's request to enforce its terms be construed evaluated under New York law.

### B.    The Settlement Agreement is Valid and Enforceable

"[A] contract is defined under New York law [as] an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound."  *Meloni v. RGM Distribution, Inc.*, 201 F. Supp. 3d 360, 370 (E.D.N.Y. 2016) (citing *Fisher v. Int'l Student Exch., Inc.*, 38 F.Supp.3d 276, 282 (E.D.N.Y. 2014)).  Consideration consists of "a benefit to a promisor or a detriment to the promise."  *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228, 252 (S.D.N.Y. 1999) (citing *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464 (N.Y. 1982)); *Van Bortel v. Ford Motor Co.*, 621 F. Supp. 3d 380, 386 (W.D.N.Y. 2022) (explaining that consideration is "is a bargained-for exchange of promises or performance").  Under New York law, "[c]onsideration to support an agreement exists where there is 'either a benefit to the promisor or a detriment to the promisee.'" *Genger v. Genger*, 76 F. Supp. 3d 488, 498 (S.D.N.Y. 2015) (quoting *Hollander v. Lipman*, 885 N.Y.S.2d 354, 355 (N.Y. App. Div. 2009)), *aff'd,* 663 F. App'x 44 (2d Cir. 2016) (summary order).  "Absent fraud or unconscionability, the adequacy of consideration is not a

proper subject for judicial scrutiny." *Fidus Mezzanine Cap., L.P. v. Fibers Plus, LLC*, No. 24-CV-3452 (JPO), 2025 WL 902894, at *4 (S.D.N.Y. Mar. 25, 2025) (quoting *Apfel v. Prudential-Bache Sec. Inc.*, 81 N.Y.2d 470, 476 (N.Y. 1993)).

The consideration requirement "is not exacting—each party must simply receive 'something of value.'" *In re Celsius Network LLC*, 647 B.R. 631 (Bankr. S.D.N.Y. 2023) (quoting *Apfel*, 81 N.Y.2d at 476), *leave to appeal denied*, 2023 WL 2648169 (S.D.N.Y. Mar. 27, 2023).

"A valid contract requires 'a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" *City Calibration Centers Inc. v. Heath Consultants Inc.*, 727 F. Supp. 3d 332, 352 (E.D.N.Y. 2024) (quoting *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 320 (S.D.N.Y. 2012)); *Int'l Mins. & Res., S.A. v. Pappas*, 96 F.3d 586, 593 (2d Cir. 1996) (stating that under New York law, "a contract is formed when all of the contracting parties express an intent to be bound and where all of the essential terms of the agreement have been spelled out.").

"Under New York law, written agreements are construed in accordance with the parties' intent and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.'" *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (N.Y. 2013). "Accordingly, 'when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms.'" *Chigirinskiy*, 319 F. Supp. 3d at 729 (quoting *S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*, 4 N.Y.3d 272, 277 (N.Y. 2005)).

Here, the parties entered into a valid and binding agreement that Defendants would repay their debts owed to Plaintiff under the Loan Agreement on an amended and expedited basis. Despite Defendants' prior default under the Loan Agreement that gave rise to this action, Plaintiff offered an alternative and extended payment schedule for Defendants through the written

Settlement Agreement. Dkt. No. 26-1 at 11-12. As a result, Plaintiff agreed to refrain from exercising its right to collect the Collateral from Defendants as permitted under the Security Agreement and Guarantor Security Agreements, and Defendants were not required to relinquish the property they agreed constituted Collateral. *See* Dkt. No 1-7; Dkt. No. 1-10.

Thus, and contrary to Defendants' claims otherwise (*see* Dkt. No. 34 at 7-8), the Settlement Agreement was supported by valuable consideration. *See Lebedev v. Blavatnik*, 193 A.D.3d 175, 183 (N.Y. App. Div. 2021) ("As stated by our Court of Appeals, '[a] valuable consideration, in the sense of the law, may consist either in some right, interest, profit, or benefit accruing to the one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other'" (quoting *Hamer v. Sidway*, 124 N.Y. 538, 545 (N.Y. 1891))); *MM Arizona Holdings LLC v. Bonanno*, 658 F. Supp. 2d 589, 593 (S.D.N.Y. 2009) (collecting cases and finding forbearance period contained in a forbearance agreement "sufficient consideration").

Further, Defendants accepted and signed the Settlement Agreement, as the signature of Defendants' sole member and owner, Mr. Sojka, appears at the bottom of the Settlement Agreement. Dkt. No. 26-1 at 20. The Settlement Agreement is the product of lengthy settlement negotiations between the parties that had been occurring since the early stages of this litigation. *See, e.g.*, Dkt. No. 14 (detailing that the parties were "actively engaged in settlement discussions" as of October 9, 2024. And Defendants agreed to the terms at the advice of their former counsel. *See, e.g.*, Dkt. No. 21 at 2 ("WHEREAS, Plaintiff and Defendants [] have agreed to resolve this action as set forth in the Settlement Agreement"). Where, as here, a contract is "the product of face to face negotiations and the parties entered into the agreement on the advice of counsel," the undersigned recommends that the Court find the Settlement Agreement valid and enforceable. *See Chavin v. McKelvey*, 182 F.3d 898, 899 (2d Cir. 1999); *see also DiSalvo v. Graff*, 227 A.D.2d 298,

298 (N.Y. App. Div. 1996) (affirming enforceability of settlement agreement that was drafted by competent, independent counsel); *Melchiorre v. Melchiorre*, 142 A.D.2d 558, 559 (N.Y. App. Div. 1988) (enforcing separation agreement that was negotiated by competent counsel and where the claimant was fully aware of the terms prior to signing).

Accordingly, the undersigned respectfully recommends that Defendants be found bound by the terms of the Settlement Agreement.

### C.   Defendants' Challenges to the Agreements Are Without Merit

In their response, Defendants attempt to raise various challenges to the Settlement Agreement and the underlying Loan Agreement itself in opposing Plaintiff's request to enforce the terms of the Settlement Agreement.  Dkt. No. 34.  Defendants contend that "Madwell's former CEO and CFO obtained [the Loan Agreement's] credit line by making a series of objectively false statements and materially misrepresentations to [Plaintiff]" (*id.* at 5), and that Madwell's operating agreement "proscribes a single managing member from unilaterally transferring an interest in or pledging a security interest in the company, which relates directly to the portion of Plaintiff's motion seeking a turnover of collateral" (*id.* (citation modified)).   Plaintiff responds that Defendants' claims should be rejected because those matters "were never pled in response to [Plaintiff's] Complaint" and that "all possible claims and defenses which could be asserted by Defendants against [Plaintiff] were expressly released in the Settlement Agreement."  Dkt. No. 36 at 2-3.

But, as discussed below, Defendants' arguments are without merit.

### i.   Defendants' Waived All Affirmative Defenses

First, Defendants waived all affirmative defenses when they failed to file any answer to the Complaint.  Rule 8(c)(1) of the Federal Rules of Civil Procedure requires that a party responding

to a pleading "must affirmatively state any avoidance or affirmative defense," including fraud, duress, and failure of consideration. Fed. R. Civ. P. 8(c)(1). "The general rule in federal courts is that a failure to plead an affirmative defense results in a waiver." *Great Lakes Reinsurance (UK) SE v. Herzig*, 673 F. Supp. 3d 432, 467 (S.D.N.Y. 2023) (quoting *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994)).

Here, Defendants opted to enter into the Settlement Agreement in lieu of answering the Complaint. *See* Dkt. No. 21. Defendants did so despite the Court extending Defendants' deadline to answer or otherwise respond to the Complaint on four separate occasions. *See* Text Order dated Oct. 9, 2024; Text Order dated Oct. 22, 2024; Text Order dated Oct. 29, 2024; Text Order dated Nov. 6, 2024. Defendants are thus precluded from raising any defense of fraud or duress, which come seven months after the Complaint was filed.

Nor can the Court entertain Defendants' unpleaded affirmative defenses at this stage. The Court of Appeals for the Second Circuit has instructed that unpleaded affirmative defenses should only be considered "in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *See Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 176 (2d Cir. 2014). Allowing Defendants to argue their untimely defenses would undoubtedly prejudice Plaintiff, especially given that Madwell ceased its operations on April 28, 2025. Further delay in allowing Plaintiff to enforce the terms of the Settlement Agreement could very well result in inability to collect the Collateral provided for under the Security Agreement and the Guarantor Security Agreement.

Thus, the undersigned respectfully recommends a finding that Defendants' failure to answer the Complaint resulted in a waiver of the defenses they now seek to invoke.

### ii.    Defendants Released Their Defenses

Moreover, even if Defendants had not waived their defenses, Defendants still released their ability to assert the defenses in the Settlement Agreement. Section five of the Settlement Agreement states that:

> Effective upon the execution and delivery to [Plaintiff] of [the Settlement Agreement] . . . each [Defendant] . . . together with Christopher Sojka, a present member of each [Defendant], jointly and severally, *release and forever discharge* [Plaintiff] . . . of and from any and all manner of action and actions, cause and causes of action, suits, debts, controversies, damages, judgments, executions, claims and demands whatsoever, asserted or unasserted, in law or in equity which against [Plaintiff] they ever had . . . including, without limitation, any presently existing claim or *defense* whether or not presently suspected, contemplated, or anticipated and *including but not limited to any claim that relates to, in whole or in part, directly or indirectly to the making or administration of the Loans*.

Dkt. No. 26-1 at 12-13 (emphasis added).

Courts have found that similar broad and unambiguous language contained in release provisions in other cases encompasses all claims and defenses like the ones presently raised by Defendants. *See, e.g.*, *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985) (affirming finding that broad, unambiguous release included all claims); *Pickwick Commc'ns, Inc. v. Weinberg*, No. 91-CV-642 (AGS), 1994 WL 620950, at *13 (S.D.N.Y. Nov. 8, 1994) ("In short, we find no reason to depart from the well established rule that, in interpreting a release under traditional contract principles we are compelled to bar claims [and defenses] precluded by the plain language of the release, including allegations of fraud"), *aff'd* 89 F.3d 825 (2d Cir. 1995); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 254-55 (S.D.N.Y. 2022) ("It is well established under New York law that a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between parties"); *cf. Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 36 (2d Cir. 1999) (surveying law and upholding enforcement of broad waiver clause in guarantee agreement that

24

included asserted defenses); *Wells Fargo Bank, N.A. v. Bivona & Cohen, P.C.*, No. 12-CV-5212 (RA), 2015 WL 5752595, at *11 (S.D.N.Y. Sept. 30, 2015) (finding the defenses raised by the defendant was expressly released in a prior guarantee agreement).

Moreover, Defendants fail to show any circumstances that might render the Settlement Agreement or release provision void. "A signed release shifts the burden going forward to the party releasing the claim to show that there has been fraud, duress or some other fact which will be sufficient to void the release." *Herzig*, 673 F. Supp. 3d at 449 (citation modified). Defendants' attempts to undermine the validity of the Settlement Agreement are entirely speculative and conclusory. *See, e.g.*, Dkt. No. 34 at 8 (asserting that the Settlement Agreement was signed "under duress" without further support). Instead, and as explained above, the Settlement Agreement, is valid and enforceable: it was voluntarily signed by Mr. Sojka when he was represented by competent counsel. Dkt. No. 26-1 at 20. As "a court should enforce a valid release by its clear terms," *see Ladenburg Thalmann & Co. v. Imaging Diagnostic Sys., Inc.*, 176 F. Supp. 2d 199, 204 (S.D.N.Y. 2001), the undersigned respectfully recommends that Defendants be found to have released the defenses it now raises when the Settlement Agreement was signed.

### D.    The Default Provision of the Settlement Agreement Should Be Enforced

Plaintiff seeks to enforce the remedies provided under the Settlement Agreement for Defendants' default under the payment schedule. Dkt. No. 26-2 at 3, 5-6. The relevant provision of the Settlement Agreement provides:

> ENTRY OF STIPULATED JUDGMENT UPON DEFAULT. Upon the occurrence of any Event of Termination . . . the [United States District Court for the Eastern District of New York, styled *Bank of America, N.A. v. Madwell LLC, et al.*, and docketed therein as Case No. 24-cv-06005] is hereby authorized by all Parties hereto, upon submission by [Plaintiff] of a Declaration setting forth (a) the Payment Default, (b) the portion, if any, of the Settlement Payments actually received by Bank previously applied to the Total Indebtedness, and (c) the amount of the Total Indebtedness then remaining unpaid (the "Judgment Amount"), to enter

> Judgment in the Enforcement Action . . . in favor of [Plaintiff] and against each of the [Defendants] for, among other things, turnover of the Collateral and, jointly and severally, for the Judgment Amount.

Dkt. No. 26-1 at 12. As explained above, the Settlement Agreement defines an "Event of Termination" as, *inter alia*, "[t]he failure of [Defendants] to make any payment required under the terms of this Agreement." *Id.* at 15.

Here, it is undisputed that Defendants failed to make all payments due to Plaintiff under the Settlement Agreement. *See* Dkt. No. 25 ("the undersigned hereby confirms that the Defendants did not timely make all payments due pursuant to the terms of that certain Settlement Agreement dated November 8, 2024"). Further, Plaintiff attached to their motion the pertinent declaration "setting forth (a) the Payment Default, (b) the portion, if any, of the Settlement Payments actually received by Bank previously applied to the Total Indebtedness, and (c) the amount of the Total Indebtedness then remaining unpaid[.]" Dkt. No. 26-1 at 12; Dkt. No. 26-1 at 2-5 (containing Plaintiff's declaration).

Accordingly, the undersigned respectfully recommends that Plaintiff has satisfied its requirements under the Settlement Agreement entitling it to entry of judgment in its favor, as well as the turnover of Collateral for the judgment amount.

### E.    Entry of Judgment and Turnover of Collateral

In the declaration, Plaintiff represents that it received the first principal reduction payment pursuant to the Settlement Agreement "in the amount of $400,000.00" on November 15, 2024, as well as the monthly interest payment due under the Settlement Agreement as of November 30, 2024. Dkt. No. 26-1 at 3. Defendants failed to provide any further payments.

Plaintiff therefore represents that the outstanding balance Defendants owe is $4,100,359.81, comprising $3,641,666.85 in principal; $29,548.92 in contract interest to January

6, 2025; $124,452.79 in default interest to January 6, 2025; $131,711.80 in deferred interest from July 1, 2024 to September 30, 2024; $16,000.00 in late charges; and $156,979.45 in unreimbursed attorneys' fees and costs to January 8, 2025. *Id.* at 4. Additionally, Plaintiff contends that "[i]nterest and default interest continues to accrue at the per diem rate of $1,384.54 [] after January 6, 2025." *Id.*

After review of Plaintiff's submissions and upon satisfaction that the declaration complies with the terms set forth for entry of judgment in the event of Defendants' default under the Settlement Agreement, the undersigned respectfully recommends entry of a money judgment in favor of Plaintiff in the amount of: (1) $4,100,359.81; plus (2) interest and default interest from January 6, 2025 to the date of entry of judgment at the rate of $1,384.54 per diem.

Furthermore, and pursuant to the terms of the Security Agreement and Guarantor Security Agreement, the undersigned respectfully recommends that entry of an order directing Defendants to turnover those items defined as Collateral under the Security Agreement and Guarantor Security Agreement, as well as the provisions concerning collection and disposal of the Collateral as proposed by Plaintiff. *See* Dkt. No. 26-1 at 25-26.

## IV.  <u>Conclusion</u>

Accordingly, the undersigned respectfully recommends that Plaintiff's Motion to enforce the terms of the Settlement Agreement be granted, and that the Court enter a money judgment in favor of Plaintiff for the amount of $4,100,359.81 plus interest and default interest at the rate of $1,384.54 per day from January 6, 2025 to the date judgment is entered. The undersigned further recommends that the Court order Defendants to turnover the Collateral as contained in the Security Agreement and Guarantor Security Agreement and to direct collection and disposal of the Collateral as proposed by Plaintiff (Dkt. No. 26-1 at 25-26).

A copy of this Report and Recommendation is being electronically served on counsel.

Any objections to this Report and Recommendation must be filed within 14 days after service of this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). *See also* Fed. R. Civ. P. 6(a) & (d) (addressing computation of days).  Any requests for an extension of time for filing objections must be directed to Judge Donnelly.  Failure to file objections within this period designating the particular issues to be reviewed waives the right to appeal the district court's order.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010); *Kotlyarsky v. United States Dep't of Just.*, No. 22-2750, 2023 WL 7648618 (2d Cir. 2023); *see also Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:          Brooklyn, New York
                June 10, 2025                          **SO ORDERED.**

                                                        */s/ Joseph A. Marutollo*
                                                        JOSEPH A. MARUTOLLO
                                                        United States Magistrate Judge